Geoffrey R. Kaiser, Esq. (GK-6991)
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071

Attorney for [under seal]

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 0 8 2014 ★

**BROOKLYN OFFICE**

BLOCK, J.

LEVY, M.J.

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------

UNITED STATES OF AMERICA and
NEW YORK STATE, ex rel.
[UNDER SEAL],

                 Plaintiffs,

       vs.

[UNDER SEAL],

                 Defendants.

-----------------------------------------------

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. _____

COMPLAINT FOR VIOLATIONS OF
FEDERAL CIVIL FALSE CLAIMS ACT
[31 U.S.C §§ 3729 *et seq.*] and NEW YORK
FALSE CLAIMS ACT [N.Y. Finance Law §§
187 *et seq.*]

**(FILED *IN CAMERA* AND UNDER SEAL)**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and NEW YORK STATE, ex rel. ELLYN D. WARD, | : : : | Case No. _____ |
| Plaintiffs, | : | COMPLAINT FOR VIOLATIONS OF FEDERAL CIVIL FALSE CLAIMS ACT [31 U.S.C §§ 3729 *et seq.*] and NEW YORK FALSE CLAIMS ACT [N.Y. Finance Law §§ 187 *et seq.*] |
| vs. | : | |
| MJHS HOSPICE AND PALLIATIVE CARE, INC. and METROPOLITAN JEWISH HEALTH SYSTEM FOUNDATION, | : : | JURY TRIAL DEMANDED **(FILED *IN CAMERA* AND UNDER SEAL)** |
| Defendants. | : : | |

-------------------------------------------------------x

Plaintiff-Relator Ellyn D. Ward, through her attorneys of record, on behalf of the United States of America and New York State, for her Complaint against Defendants MJHS Hospice and Palliative Care, Inc. ("MJHS-HPC") and Metropolitan Jewish Health System Foundation ("MJHS Foundation"), alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

I.  **NATURE OF THE ACTION**

1.  This is an action to recover damages and civil penalties on behalf of the United States of America and New York State arising from false and/or fraudulent statements, records, and claims made and caused to be made by Defendants and/or its agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*

2.     As detailed below, Defendants knowingly engaged in a fraudulent course of conduct that, on information and belief, caused millions of dollars in losses to the Medicare and Medicaid programs, by inducing: (a) payments for hospice care rendered to patients who did not actually qualify for hospice benefits; and (b) payments by the Medicare Part D program for prescription drugs that should either have been paid as part of the patient's hospice benefit, or should not have been paid at all because the medications were medically unnecessary.

3.     The fraudulent practices described above constituted "false and fraudulent" claims under the Federal Civil False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.* and the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.* Such claims cheated the government and unlawfully enriched the Defendants.  Therefore, Plaintiff-Relator, Ellyn D. Ward seeks to recover all available damages, civil penalties, and other relief for violations alleged herein.

**II.   PARTIES**

4.     Plaintiff-Relator Ellyn D. Ward ("Relator") resides in New Jersey.  Relator was employed by MJHS-HPC from in or about July 2012 to in or about May 2013.  Shortly after her initial hire, Relator began working in the MJHS-HPC Access Center, where decisions related to patient intake and admission were made.  Relator's responsibilities included receiving information related to hospice admissions, scheduling admissions and screening referral information.  In or about November 2012, Relator became the Manager of the Murial and Harold Block Residence ("Block") and the Mollie and Jack Zicklin Residence ("Zicklin"), both of which were MJHS-HPC hospice residences in the Bronx.  Block was a 16 bed residence and Zicklin was an 18-bed residence.  Relator continued to manage both residences until in or about April 2013, when MJHS-HPC hired someone else to manage Zicklin.  In these positions, Relator had

3

first-hand knowledge of the protocols implemented by MJHS-HPC for the enrollment of hospice patients in its facilities, and she participated in numerous conversations and meetings with MJHS-HPC supervisory personnel during which these protocols were discussed. Relator personally witnessed many examples of non-qualifying patients being admitted by MJHS-HPC to its hospice facilities in an effort to enhance insurance revenues from Medicare and Medicaid. During her tenure with MJHS-HPC, Relator also interacted with nursing staff responsible for coordinating the medication regimens of MJHS-HPC hospice patients residing at skilled nursing and assisted living facilities. Relator came to learn that MJHS-HPC knowingly or recklessly neglected its responsibility to coordinate medications as required and that, as a result, Medicare Part D was improperly charged for many medications, some of which were more expensive alternatives to drugs that should have been paid by MJHS-HPC from the Medicare hospice benefit, and some of which were medically unnecessary for end-of-life hospice patients and thus non-reimbursable. Relator resigned her position at MJHS-HPC, effective May 9, 2013.

5.     Defendant MJHS-HPC is a New York not-for-profit corporation headquartered in Manhattan at 39 Broadway, Suite 201. MJHS-HPC describes itself as one of the largest and most respected not-for-profit hospice and palliative care programs in the New York region. MJHS-HPC offers its services at hospice residences in the Bronx, Manhattan and Brooklyn, and in hospitals, nursing homes, skilled nursing facilities, assisted living facilities and in patient homes located in all five boroughs of New York City and on Long Island.

6.     Defendant Metropolitan Jewish Health System Foundation is a New York not-for-profit corporation headquartered in Manhattan at 440 Ninth Avenue, 14th Floor. According to its website, MJHS Foundation raises and allocates the funds necessary to ensure the continuation of health care programs and services in the Greater New York Metropolitan Area.

## III.   JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.  Under 31 U.S.C. § 3730(e), there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Relator is the original source of the facts and information alleged in this Complaint.

8.      This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a), because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States.  Moreover, the Defendants can be found in this District and/or transact business in this District.

9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), because the Defendants can be found in and/or transact business in this District. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees in this District and/or can otherwise be found and reside in this District.  In addition, statutory violations, as alleged herein, occurred in this District.

## IV.   APPLICABLE LAW

### A.      The False Claims Act

10.     The FCA was originally enacted during the Civil War and was substantially amended in 1986. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it. The amendments were intended to create incentives for individuals with knowledge of fraud against the government to

disclose the information without fear of reprisals or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the government's behalf.

11.    The FCA prohibits knowingly presenting or causing to be presented to the federal government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Additionally, it prohibits knowingly making or using a false or fraudulent record or statement "material to a false or fraudulent claim" paid or approved by the federal government, or "material to an obligation to pay" money to the government and further prohibits knowingly concealing and improperly avoiding or decreasing "an obligation to pay" money to the government. 31 U.S.C. § 3729(a)(1)(B), (G).  Pursuant to 31 U.S.C. § 3729(a)(1)(B), a false or fraudulent statement or record that is made for the purpose of causing the government to pay a claim, even if the fraudulent statement or record is not proffered directly to the government, is still actionable where there is some nexus between the statement or record and the payment of the claim.  Furthermore, both affirmative misrepresentations and the omission of facts material to a governmental decision to pay can render a claim false under the FCA.  The FCA also prohibits two or more parties from conspiring to violate any of the liability provisions of the statute. 31 U.S.C. § 3729(a)(1)(C).

12.    Any person who violates, or conspires to violate, the FCA is liable for a civil penalty of up to $11,000 per claim for claims made on or after September 29, 1999, plus three times the amount of the damages sustained by the United States. 31 U.S.C. § 3729(a).

13.    The FCA does not require direct contact between a Defendants and the government. By its terms, the FCA imposes liability on any person who presents or *causes* to be presented a false or fraudulent claim to the government (or false statement in support of a false or fraudulent claim). See 31 U.S.C. § 3729(a).

14.     To "cause" an FCA violation, it is not necessary that a Defendants' fraudulent conduct be the last in the series of events that results in financial loss to the government. As applied by the courts, the standard for "causation" under the FCA is whether the submission of a false or fraudulent claim was "reasonably foreseeable" from a Defendants' actions. Under this standard, a Defendants' fraudulent conduct can occur anywhere in the chain of events leading to financial loss by the government, and can be an indirect, as well as direct, cause of the loss. Moreover, the Defendants need not be the recipient or beneficiary of the false claim. All that is required is that the Defendants, by its fraudulent conduct, set in motion a series of events which results in a reasonably foreseeable loss to the government.

15.     The FCA defines a "claim" to include any request or demand, whether under contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested.

16.     The federal anti-kickback statute (42 U.S.C. § 1320a-7b(b)) prohibits the payment or solicitation of any form of remuneration (directly or indirectly, overly or covertly, in cash or in kind) in exchange for the referral or any item or service payable under a federal health care program, including Medicare and Medicaid. A "false claim" is defined by statute to include any claim incorporating items or services resulting from a violation of the anti-kickback statute:

> (g) In addition to the penalties provided for in this section [i.e., 42 U.S.C. § 1320a-7b] . . . a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [31 U.S.C. §§ 3729 et seq.]

17.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery. The FCA requires that the

7

complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to allow the government time to conduct its own investigation and to determine whether to join the suit.

18.     The New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, is modeled after the FCA, and its liability provisions are virtually identical. Similarly to the FCA, any person who violates, or conspires to violate, the New York False Claims Act is liable for three times the amount of the damages sustained by New York State. In addition, a violator faces a civil penalty of up to $12,000 per claim.

**B.      The Federal Health Care Programs**

19.     The health care programs described in the paragraphs below, and any other government-funded healthcare programs, shall be referred to as "Federal Health Care Programs."

20.     The Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, *et seq.* ("Medicare") is a health insurance program administered by the United States that is funded by taxpayer revenue. Entitlement to Medicare is based on age, disability or affliction with certain diseases. The program is overseen by the United States Department of Health and Human Services ("HHS") through the Centers for Medicare and Medicaid Services ("CMS"). Medicare provides for payment of hospital services, medical services, durable medical equipment and prescription drugs on behalf of Medicare-eligible beneficiaries.

21.     Claims submitted to Medicare for payment, whether submitted on a paper UB-04 (CMS-1450) Claim Form, or electronically, carry certifications of truth and accuracy. The paper Claim Form carries a certification that the billing information on the form is true, accurate and complete, and that the provider submitting the form did not knowingly or recklessly disregard or misrepresent or conceal material facts. UBS-04 CMS-1450 Form. The Claim Form further states

8

that the person or entity submitting the form "understands that misrepresentation or falsification of essential information as requested" by the form "may serve as the basis for civil monetary penalties and assessments and may upon conviction include fines and/or imprisonment . . . ." *Id.* Those who submit claims electronically are likewise required to certify that the claims are "accurate, complete and truthful" and to "acknowledge that all claims will be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim . . . may, upon conviction, be subject to a fine and/or imprisonment under applicable Federal law." Medicare Claims Processing Manual, Chapter 24, 30.2.

22.     The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v ("Medicaid") is a health insurance program administered by the United States and individual states and is funded by federal, state and local taxpayer revenue.   The Medicaid Program is overseen by HHS through CMS.   Medicaid was designed to assist participating states in providing medical services, durable medical equipment and prescription drugs to financially needy individuals that qualify for Medicaid.   The Medicaid program pays for services pursuant to plans developed by the States and approved by HHS through CMS.   42 U.S.C. §§ 1396a(a)-(b).   States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as Federal Financial Participation.

23.     New York maintains a federally-approved Medicaid program to reimburse health care charges made by physicians and other health care providers for the treatment of many low-income New York citizens not covered by Medicare or private insurance. Claims submitted to the New York Medicaid Program cause payments to be made by both the United States and New York State. The United States and New York State contribute approximately half the cost of each claim submitted to the New York Medicaid Program. Providers apply to participate in the New York Medicaid Program and agree as a condition of both participation and payment to comply with all the policies and procedures of the New York Department of Health ("DOH"), which administers the Medicaid Program in New York State. All claims submitted to the Medicaid Program, whether on paper or electronically, carry a Claim Certification Statement that certifies the provider's agreement to these conditions. The Certification Statement further states that all information included on the claim form is "true, accurate and complete" and that "no material fact has been omitted." New York State Medicaid Program, Information for All Providers, General Billing, p. 6; eMedNY/Medicaid Management Information System, Certification Statement for Provider Billing Medicaid. In addition, the Certification Statement includes an acknowledgement that "payment and satisfaction of this claim will be from federal, state and local public funds and that I may be prosecuted under applicable federal and state laws for any false claims, statements or documents or concealment of a material fact." _Id._

24.     DOH policies and procedures include an explicit exclusion from Medicaid coverage for medical care and services that are "fraudulently claimed" or "represent abuse or overuse," and define as an "unacceptable practice" when a provider "knowingly [makes] a claim for an improper amount or for unfurnished, inappropriate or excessive care, services or supplies." DOH also defines Medicaid fraud to include a provider who "submits false information for the

purpose of obtaining greater compensation than that to which he/she is legally entitled." New York State Medicaid Program, Information for All Providers, General Policy, pp. 22-25. DOH further reserves the right to recover any overpayments, including "any amount not authorized to be paid under the Medicaid Program, whether paid as the result of inaccurate or improper cost reporting, improper claiming, unacceptable practices, fraud, abuse or mistake." *Id.*

25.     To participate in Medicare and Medicaid, providers must be duly licensed and authorized by the States in which they practice to render professional services. See Medicare General Information, Eligibility and Entitlement, Chapter 5, 70.3; 18 NYCRR § 505.12.

**C.     Hospice Benefits Under Medicare and Medicaid**

26.     Hospice care is an elected benefit under Medicare Part A for qualifying individuals.  To be eligible for the hospice benefit under Medicare, an individual must be certified as having a terminal illness with a medical prognosis of 6 months or less if the illness runs its normal course.  In addition, the individual must receive care from a Medicare-approved hospice program and must sign a statement indicating that he or she is electing the hospice benefit and waiving all other rights to Medicare payment for services related to the treatment of the individual's terminal illness and related conditions ("terminal illness").  Medicare will continue to pay, however, for covered services unrelated to the individual's terminal illness.

27.     The Medicare hospice benefit includes coverage for the following:

- Physician services furnished by Hospice-employed physicians and nurse practitioners (NP) or by other physicians under arrangement with the hospice provider;
- Nursing care;
- Medical equipment;
- Medical supplies;
- Drugs for pain and symptom management;
- Hospice aide and homemaker services;
- Physical therapy;
- Occupational therapy;

11

- Speech-language pathology services;
- Social worker services;
- Dietary counseling;
- Spiritual counseling;
- Grief and loss counseling for the individual and his or her family before and after death;
- Short-term inpatient care for pain control and symptom management and for respite care; and
- Any other Hospice services, as specified in the patient's plan of care (POC) and furnished or arranged by the hospice provider, as reasonable and necessary, and for which payment may otherwise be made under Medicare.

28.   Medicare will not pay for the following services when the hospice benefit is chosen:

- Hospice care furnished by a Hospice other than the Hospice designated by the individual (unless furnished under arrangement by the designated Hospice);
- Any Medicare services that are related to treatment of the terminal illness or related conditions for which Hospice care was elected or that are equivalent to Hospice care, with the exception of the following:
  - o Care furnished by the designated Hospice;
  - o Care furnished by another Hospice under arrangements made by the designated Hospice; or
  - o Care furnished by the individual's attending physician who is not an employee of the designated Hospice or receiving compensation from the Hospice under arrangement for those services;
- Hospice care furnished by a Hospice other than the Hospice designated by the individual (unless furnished under arrangement by the designated Hospice);
- Room and board, unless it is for short-term inpatient care that the hospice provider arranges; and
- Covered care in an emergency room, hospital, or other inpatient facility; outpatient services; or ambulance transportation, unless these services are either arranged by the hospice provider or are unrelated to the terminal illness.

29.   Hospice care is available for two periods of 90 days and an unlimited number of subsequent 60-day periods.  Medicare pays hospices a daily rate for each day a patient is enrolled in the hospice benefit.  Daily payments are made regardless of the amount of services furnished on a given day.  The payments are intended to cover the costs incurred by the hospice

provider in furnishing services identified in the patient's POC, including services provided directly or arranged by the hospice provider. Payments are made based on the level of care required to meet patient and family needs. The levels of care are: (1) Routine home care; (2) Continuous home care; (3) Inpatient respite care; and (4) General inpatient care. Hospice payment rates before wage adjustment for hospices that reported quality data in 2013 appear in the chart below:

FY 2014 Hospice Payment Rates Before Wage Adjustment for Hospices That Reported Quality Data in 2013

| Code | Description | Rate | Wage Component Subject to Index | Non-Weighted Amount |
|------|-------------|------|--------------------------------|---------------------|
| 651 | Routine Home Care | $156.06 | $107.23 | $ 48.83 |
| 652 | Continuous Home Care Full Rate = 24 Hours of Care $37.95 = Hourly Rate | $910.78 | $625.80 | $284.98 |
| 655 | Inpatient Respite Care | $161.42 | $ 87.38 | $ 74.04 |
| 656 | General Inpatient Care | $694.19 | $444.35 | $249.84 |

30.  The Medicaid Program also provides a hospice benefit. To be eligible for hospice care under Medicaid, the individual's physician and the hospice medical director or designee must certify the individual as having a terminal illness. As with the Medicare hospice benefit, a terminal illness is defined as a medical prognosis for a life expectancy of six months or less if the illness runs its normal course. Individuals choosing hospice care agree to forego other Medicaid or Medicare services for terminal illness.

31.  The Medicaid hospice benefit covers the following services:

- Nursing;
- Physician;
- Physical Therapy;
- Occupational Therapy;
- Speech and Language Pathology;
- Medical Supplies and Equipment;
- Home Health Aide and Homemaker;
- Bereavement;
- Pastoral Care;

13

- Pharmaceutical/Laboratory;
- Social Work;
- Nutrition;
- Psychological;
- Audiology; and
- Respiratory Therapy.

These services may be provided in the home, a nursing home, assisted living facility, free standing hospice, hospital or hospice residence.  The services must be provided according to a written plan of care and be focused on easing the symptoms of the terminal illness rather than curing the disease.

32.   Medicaid does not cover the following services in combination with the hospice benefit:

- Private Duty Nursing;
- Long Term Home Health Care Program/Lombardi Program;
- Certified Home Health Agency Services; and
- Adult Day Health Care service.

33.   Medicaid reimburses for hospice care as follows:

- For routine home care using an all-inclusive daily reimbursement rate;
- Continuous home care during periods of crisis;
- General inpatient care for pain or symptom management;
- Inpatient respite to relieve caregivers; and
- Room and board for individuals receiving hospice care in a skilled nursing facility or hospice residence.

## V.   FACTS UNDERLYING THE FRAUD SCHEMES

### A.   The Fraudulent Scheme to Admit Patients Not Eligible for Hospice Benefits

34.   MJHS-HPC engaged in a pattern and practice of admitting  patients in order to reach a particular patient census "goal" established by Barbara Hiney, Executive Vice President of MJHS-HPC, in connection with the proposed budget.  This was done irrespective of whether the patients who were admitted actually qualified for hospice benefits.  The census goal was posted

14

on the wall at the entrance to the Access Center, which was located in Suite 201 of 39 Broadway, adjacent to the reception area and the Executive Conference Room. The Access Center was where patient admissions and hospice care scheduling occurred. The actual daily patient census was posted underneath the goal. Therefore, the difference between the goal and actual census was strongly defined.

35.     Whenever the daily census was significantly below the goal, Susan Lage (Director of Marketing), Joyce Palmieri (Assistant Vice President at MJHS-HPC), and Teresa D'Alessio (Manager of the Access Center) would urge MJHS-HPC patient admissions personnel to admit any and all patients in order to reach the goal. A daily email containing patient census information was issued to the Access Center staff, Managers, and Admission RNs, and if the census was nearing the goal, emails would circulate through MJHS-HPC in celebration, containing messages like "Woo-hoo, we are almost there!" or "Congratulations - we are almost there!" or "Let's do it !" or "Let's get to work people!"  No consideration at all was given to the fact that the census number represented terminally ill patients.  On information and belief, that was because employees knew, in some cases, that the patients were not terminally ill.

36.     Relator repeatedly overheard the Manager of the Access Center, Teresa D'Alessio, make comments to the MJHS-HPC admission nurse urging her to admit patients.  These comments included advice such as "just admit him, we will work it out later" or "just admit him, don't worry, we will figure something out" or "don't tell me they did not sign" (referring to the fact that the patient did not elect the hospice benefit) or "do the best you can with the documentation and just sign them up" (referring to the hospice criteria documentation).  MJHS-HPC also pressured nurses to "convert" patients to hospice who did not necessarily desire hospice services.  Admitting nurses were written up and/or dismissed for low productivity if they

15

did not enroll enough patients, and nurses were pressured to admit patients who did not appear to have evidence of a terminal condition. Nurses were formally and informally evaluated based on their "conversion rate" for admitting or not admitting patients. Teresa D'Alessio would review this information on a regular basis.

37.   MJHS-HPC also engaged in a fraudulent practice of certifying and re-certifying for hospice care residents at skilled nursing facilities ("SNFs") and assisted living facilities ("ALFs") who were chronically ill, but who lacked any documentation establishing a terminal illness, and thus were not qualified to receive hospice benefits.

38.   Joyce Palmieri frequently told Relator that "We need 100% occupancy" or "We need to be at Full Capacity" in both the Block and Zicklin hospice residences. Palmieri required Block and Zicklin to be fully occupied at all times, each and every day. Relator received directives from the Access Center to transfer patients into or admit patients into Block and Zicklin who were not terminally ill in order to reach MJHS-HPC's census goal and to ensure there were no empty beds in either residence. Relator also was present for Interdisciplinary Team meetings held weekly in a conference room at Block at which Stephen Tapley, an MSJH-HPC Bronx Manager, discussed the need to document patient charts as negatively as possible so that the patient could be certified or re-certified for hospice care in the residences.

### Illustrative Patient Examples

39.   A 31 year-old female patient at Zicklin ("Patient A") had been diagnosed with a chronic debilitating lung disease. Patient A received Medicaid, which covered private room and board charges, and also received Medicare because she was permanently disabled. Relator was told that the Medicare hospice benefit for Patient A was certified and recertified for seven years! Relator was advised by Carolyn Genereaux at Zicklin that Patient A was living in Zicklin before MJHS-HPC had even acquired the residence. When, in or about November 2012, Relator

questioned Joyce Palmieri and an MSJH-HPC social worker, Carolyn Genereaux, concerning why Patient A was living at Zicklin, their response was "Where do you want her to go?" Relator, however, insisted that Patient A had no lab testing or pulmonary function testing to indicate that she could have been appropriately re-certified as a hospice patient with six months or less to live for a continuous seven year period. A physician employed by MJHS-HPC -- Dr. Hatsengate -- eventually agreed with Relator's assessment and, in or about December 2012, Patient A was transferred to an ALF located in Jewish Home Lifecare, Bronx, NY. Patient A spent a few months there in a private room and eventually moved home with her mother and her son to live in the home where she started approximately seven years earlier.

40.   An elderly female patient at Zicklin ("Patient B"), who was a resident at the time Relator became Manager of the facility, was from the Long Island area and wore a head turban and her pajamas every day while wearing full make-up. Patient B could be confused at times, but she was not terminally ill. When Relator first came to Zicklin, Patient B was in a large private room because she was a "private pay" patient. After a period of time, however, Patient B became a Medicaid patient receiving hospice benefits. Medicaid was charged for her room and board and she was required to move to a smaller room with a shared bathroom. Relator insisted to her supervisors that Patient B was not terminally ill and, once again, Dr. Hatsengate agreed with Relator's assessment. A discharge plan for Patient B was then prepared. Patient B never satisfied the criteria for hospice benefits, but was admitted by MJHS-HPC so that Zicklin could maintain full occupancy and the patient census goal could be attained.

41.   In or about March 2013, on a Thursday afternoon, another female patient ("Patient C") was transferred from one of MJHS-HPC's General Inpatient Units, located in Mount Sinai Beth Israel Hospital. Patient C was transferred by ambulance to Block and, upon arrival, was

exhibiting psychotic behavior.  No anti-psychotic medications had  been ordered, and due to her psychosis, she refused to take medications that were ordered by her doctor,  in any event. Joyce Palmieri directed Relator, in words or substance: "Get an injectable medication to calm her down and hold her down and give her the medication. Try to get her calmed down." Relator rejected this strategy to administer medication.  Patient C also carried a bacterial infection resistant to antibiotics in her urine, which required that contact precautions be implemented and that Patient C be confined to her assigned studio apartment.  As a result of her mental illness, Patient C did not understand where she was or why she was there, and she made repeated attempts to "escape" her apartment at Block.  Most important, Patient C was **NOT** terminally ill.

42.   MJHS-HPC had transferred Patient C to Block as a favor to the hospital because Patient C had been at the hospital "too long."  After Relator called an ambulance to transport Patient C back to the hospital from which she was transferred, Relator was confronted the following day by her supervisors, Joyce Palmieri and Barbara Hiney.  Relator engaged in heated discussions with Palmieri and Hiney over her decision to transfer Patient C back to the hospital.  Palmieri was furious with Relator, demanding to know why Relator sent Patient C to the hospital's emergency room rather than to the MJHS-HPC hospice inpatient unit at the hospital.  Relator responded that Patient C could not consent to anything due to her mental illness, and that she had no guardian, health care proxy or next of kin.  Relator also pointed out that Patient C was not terminally ill and did not qualify for hospice benefits.

43.   Relator's supervisors did not accept her explanation and, after declining to accept Relator's invitation to contact MJHS-HPC's Compliance Officer, Hiney decided to set up a phone call with herself, Relator and MJHS-HPC Chief Medical Officer Russell Portenoy for

18

the following Monday at 9am. Hiney told Relator that Patient C would be returning to Block

"whether you like it or not" because it would eliminate an empty bed at Block and increase the

patient census, while also doing a favor for the hospital. When Monday arrived, Relator was

informed by Hiney's assistant that both the phone call and Patient C's transfer back to Block

had been cancelled. Relator found out later that day from Palmieri that the conference and the

transfer back into the Block were cancelled because an attorney for the hospital confirmed that

the patient should never have been moved without the consent of a court-appointed guardian.

There was no guardian in place for Patient C at that time.

44.    In or about March 2013, an energetic male dialysis patient in his 40's ("Patient D")

was transferred from the hospital to Block with a dialysis fistula newly inserted in his arm for

future dialysis treatments. Relator came to learn that Patient D had been homeless before being

hospitalized for poor kidney function, but there was no documentation in his chart to support a

diagnosis of End Stage Renal Disease, his lab work indicated Chronic Kidney disease and he

was not otherwise terminally ill. Patient D hallucinated and heard voices, symptoms for which

he refused treatment, but his behavior was otherwise within a normal range for Block and he

usually stayed in his room. Patient D was adept at doing 10 pushups, and enjoyed showing off

to Block employees, who could not do the same. Relator once overheard Patient D say to

someone on the phone: "You would not believe how nice this shelter is." Relator explained to

Patient D that he was in a hospice residence, but he stated that he only wanted "to get better"

and never gave any indication that he believed he was dying.

45.    When Relator contacted the Access Center Manager, Teresa D'Alessio, and tried

to have Patient D transferred out of Block, D'Alessio replied, "Where do you want him to go?

At least he is getting taken care of-what's your problem?" Relator also raised the issue up with

Palmieri, advising her that Patient D was not terminally ill and that his chart contained no medical evidence of End Stage Renal Disease. Relator explained that Patient D ate three meals a day, took frequent soaking baths, walked around Block freely without assistance, walked freely around the Kingsbridge neighborhood unassisted, generally stayed to himself watching television and was not even receiving dialysis treatments, despite the fistula in his arm. After Palmieri also declined to address the issue further, Relator contacted an MJHS-HPC physician, who sympathized with Relator, but ultimately replied, "Where would we discharge him to? He was homeless."

46.     A male Vietnam veteran in his 60s ("Patient E") was living at Zicklin for over a year at the time Relator left MJHS-HPC. Patient E was homeless, and Relator more than once overheard him say to Zicklin employees: "How can you stand it here with everyone dying?" Patient E, by contrast, was not dying, and even asked Relator why he was being permitted to stay at Zicklin when he was not terminally ill. Patient E's chart stated that he had congestive heart failure, but he would periodically leave Zicklin for weeks at a time to live at the Staten Island Ferry building in Manhattan and drink alcohol. During these periods, Patient E did not take any medications. While at Zicklin, he also frequently appeared and smelled intoxicated. Patient E fell on the sidewalk in Riverdale while intoxicated and needed to have a cast applied to his arm while living at Zicklin. Patient E was never tested for his condition after coming to Zicklin, and therefore had no clinical evidence to prove he had a terminal diagnosis. He did not even use oxygen. Yet, he was certified and recertified for hospice care for over a year, and may still be receiving hospice benefits at Zicklin today.

47.     Another case involved a 57 year-old homeless male ("Patient F") who was

transferred to hospice care at Block in or about March 2013 from either Beth Israel Hospital or

St. Luke's Hospital. Patient F had been at the hospital for approximately three months before

being transferred to Block. Patient F suffered from Polio since birth, had only one functioning

leg and had been using multiple street drugs before arriving at the emergency room of the

transferor hospital. Patient F used oxygen intermittently, walked with a crutch or used a

wheelchair independently, was energetic and ate three meals a day. This patient was **NOT**

terminally ill. Indeed, at the time of Patient F's transfer to Block, Patient F's chart contained

no lab testing, pulmonary function testing, or any other medical evidence to support a diagnosis

of end-stage lung disease or any other terminal illness. When Relator questioned Patient F's

admission status, she was told by Joyce Palmieri "We'll deal with this later- wait and see what

happens. You know that we will never have an empty bed-we can't afford it."

48.     On another occasion, MJHS-HPC admitted a female patient ("Patient G") residing

at a Bronx ALF to hospice care without any basis. On or about December 2013, MJHS-HPC

Manager Stephen Tapley contacted Relator to check on Patient G because he had received a

call from the ALF advising that the patient wanted to go to the hospital emergency room and

that the ALF had dialed 911 on her behalf. When Relator arrived, she observed Patient G to be

an alert and well-oriented, elderly female with chest pain who expressed a desire to be

transferred to the hospital. Relator proceeded to take Patient G's vital signs and provide

medication to alleviate her discomfort. Patient G began to feel better but still wanted to go to

the emergency room. Relator mentioned that MJHS-HPC had an inpatient hospice bed at the

hospital, but Patient G was not even aware that she was receiving hospice benefits with MJHS-

HPC and did not know her MJHS-HPC nurse or when a nurse had last visited her. She had

been living alone in her well-kept studio apartment at the ALF oblivious to the fact that she had

elected hospice benefits. Patient G, in addition to **NOT** being terminally ill and thus not qualifying for hospice benefits, clearly had never knowingly elected hospice benefits in the first place. Relator was reprimanded by her superiors for allowing Patient G to be transferred to a hospital emergency room as she requested.

### B. The Fraudulent Scheme to Admit Lombardi Program Patients to Hospice Care

49. Section 1915(c) of the Social Security Act (42 U.S.C. 1396n(c)) allows states to request a waiver of certain Medicaid requirements in order to establish community-based programs for specific target populations, including frail seniors, who would other require nursing facility level of care. The Lombardi Program was a long-term home health care program established by New York State more than three decades ago as one of the nation's first comprehensive community-based service programs for beneficiaries requiring nursing home level of care. The Program provided coordinated care and services for frail seniors who would otherwise require nursing facility care. Services could be provided in the senior's home, an adult care facility (other than a shelter for adults), or in the home of a responsible adult. The Program was one of the largest 1915(c) waiver programs for aged and disabled Medicaid beneficiaries in the nation.

50. In or about November 2012, MJHS-HPC engaged in a scheme to enroll Lombardi patients into its hospice programs as a way for MJHS to continue servicing those patients, who would otherwise have transferred out of MJHS care and have been auto-enrolled into another MLTC Program. On or about April 1, 2013, CMS approved New York State's request to require all dual eligible patients (those with both Medicare and Medicaid coverage) to enroll in a Medicaid Managed Long Term Care Plan ("MLTCP"). After April 1, 2013, Lombardi patients would be required, on a rolling county by county basis, to enroll in a MLTCP or be

auto-enrolled in such a plan.  Because MJHS's MLTCP work force was not able to perform

assessments on all the Lombardi patients, MJHS would have started losing the opportunity to

service those patients after April 1, 2013.  As a temporary solution, MJHS-HPC decided to

transfer Lombardi patients who were not terminally ill and did not qualify for hospice benefits,

into its hospice programs.

51.   In or about November 2012, a meeting for MJHS-HPC managers was held in the

Executive Conference Room of the 39 Broadway office.  During that meeting, the participants

discussed transferring Lombardi patients into MJHS-HPC programs.  The meeting was led by

Joyce Palmieri and Sue Caputo, MJHS Director of Home Care and Hospice.  Since Relator was

located a significant distance from the meeting location, she participated by telephone.  During

the meeting, Palmieri and Caputo strongly recommended to MJHS-HPC managers that patients

be encouraged to transfer from Lombardi Program to MJHS-HPC programs so that they would

continue receiving services from MJHS.  On information and belief, a comparison of MJHS

Lombardi Program patients and MJHS-HPC hospice patients for 2013 will reveal many

Lombardi Program patients who were not terminally ill, but who were improperly transferred

by MJHS-HPC into its hospice programs.

### C.  The Fraudulent Scheme to Induce Referrals Through Financial Incentives

52.   While employed as Manager of Zicklin, Relator came to realize that there was a

significant gap between the revenues generated from Medicare and Medicaid  for hospice care

and the costs of running the facility.  Those costs included: (a)  the salaries of multiple

employees each day working in the facility on 12 hour shifts (including one physician salary, two

registered nurse salaries for each day shift, salaries one registered nurse and one licensed

practical nurse for each night shift and four to six home health aides per shift); (b) durable

medical equipment charges; (c) medication charges; (d) cleaning service charges; (e) medical

waste disposal charges; (f) linen supply contract charges; and (g) charges for other supplies,

including incontinence products, which were expensive.  MJHS-HPC was responsible for paying

all of those charges and Relator knew those costs exceeded available revenues.

53.    Relator inquired with Barbara Hiney as to how MJHS-HPC was able to maintain

operations at Zicklin from a financial standpoint in light of this revenue gap.  Hiney explained that

if Zicklin and Block maintained bed vacancy rates of 17 % or less, the MJHS Foundation would make

bulk payments supporting their operations.  Relator believes that this financial incentive was a principal

reason that MJHS-HPC continually admitted non-eligible hospice patients to Zicklin and Block, and

rigorously enforced a policy that prohibited the residences from having any empty beds.

54.    Utilizing the offer of substantial MJHS Foundation payments, which were needed to

maintain the solvency of hospice operations at Zicklin and Block, as a method of inducing

MJHS-HPC personnel to generate hospice patient referrals at a rate high enough to ensure a bed

vacancy rate of no more than 17%, violated the federal anti-kickback statute.  As a consequence,

no portion of the costs associated with any patient referrals that resulted from this illicit financial

arrangement was payable by any federal health care program.

### D.    The Fraudulent Scheme to Bill at Continuous Home Care Rates

55.    Continuous home care is one of four hospice levels of care that is available to

hospice patients only during a period of crisis in order to maintain an individual at home.  A

period of crisis is a period in which the individual requires continuous care to achieve palliation

and management of acute medical symptoms, such as pain, nausea, intractable vomiting,

bleeding, and frequent or unrelenting seizures.

56.    The need for continuous home care can arise in various circumstances.  For

example, if a patient's care giver has been providing a skilled level of care for the patient and the caregiver is unwilling or unable to continue providing care, this may precipitate a period of crisis because the skills of a nurse may be needed to replace the services that had been provided by the care giver. Sometimes, the need for frequent medication adjustments or the collapse of a family support system may necessitate this level of care, as may a sudden and rapid deterioration in a patient's health condition.

57.    Continuous home care is not appropriate:

- For a patient who is imminently dying with no acute skilled pain or symptom management needs.

- For caregiver breakdown with no acute skilled pain or symptom management needs. (As stated above, if a patient's caregiver has been providing a skilled level of care for the patient and the caregiver is unwilling or unable to continue providing care, this may precipitate a period of crisis because the skills of a nurse may be needed to replace the services that had been provided by the caregiver.)

- To provide respite care.

- For safety concerns (for example, falls, wandering, etc.) in the absence of a need for skilled interventions.

- As an alternative to paid caregivers or placement in another setting.

58.    At MJHS-HPC, there was a pool of Licensed Practical Nurses ("LPNs") who were designated for continuous home care. Continuous home care includes nursing care covered on a continuous basis for as much as 24 hours a day, and is reimbursed at a much higher rate. At MJHS-HPC, the continuous care rate was approximately $910/day, whereas a routine level of hospice care was billed at approximately $150/day. Accordingly, whenever an LPN was available, MJHS-HPC always preferred to bill at the continuous care rate.

59. Administrative assistants from MJHS-HPC's corporate office at 39 Broadway would call Zicklin to offer LPN continuous care services. Joyce Palmieri, in manager meetings attended by Relator, told managers that they "needed to use these continuous care nurses or they will go away" and that "I can't pay them if you will not give them continuous care cases." Managers were encouraged to "find" hospice patients who would "benefit" from having 12 hours of LPN continuous care services. MJHS-HPC did not follow the regulatory criteria defining when continuous care was appropriate. Rather, at MJHS-HPC, continuous care was provided so that the organization could bill Federal Health Care Programs at the higher reimbursement rate and so that the LPNs employed by MJHS-HPC could be given a steady stream of work.

60. For example, in or about 2012, there was a hospice patient at Zicklin ("Patient H") who received continuous care for an extended period simply because he was a known sex offender. Patient H had been taken from prison and placed in Zicklin. MJHS-HPC then billed Medicare for Patient H at the continuous home care rate for months. The charges started before Relator began working at Zicklin, but Relator heard about the case when working in the MJHS-HPC Access Center. After Relator began working at Zicklin, she attended an Interdisciplinary Team meeting at which Patient H was discussed. At that time, MJHS-HPC Manager Gerard Christophers commented that Patient H required a staff to patient ratio of 1:1 in order to maintain safety of staff and patients. Patient H did not require any skilled medical interventions and was not in a period of "crisis" within the meaning of the continuous home care criteria. Instead, MJHS-HPC billed Patient H at the continuous home care rate in the name of safety. By the time Relator assumed the role of Manager at Zicklin, Patient H had died.

61. The case of Patient H is illustrative of a pattern of fraudulent billing by MJHS-HPC

26

in which continuous home care was performed and billed for patients in the absence of any documentation or reason justifying that level of care. Vital signs typically were not taken to prove that skilled interventions on a continuous home care level were needed. Observations and assessments supporting such care were not documented. Frequently, no interventions for continuous care patients were taken to achieve palliation of physical or emotional symptoms. Continuous care patients often were not experiencing medication changes, and to the extent medication changes were made at all, the results of those changes frequently were not documented.

62.   After months of asking managers to "find" continuous care cases, Joyce Palmieri abruptly advised Relator, in or about December 2012, that MJHS-HPC would not be "doing so much continuous care anymore." Although Palmieri did not provide a reason, Relator learned from another employee that there had been some type of chart review which had concluded that MJHS was improperly billing for continuous home care.

### E.   The Scheme to Defraud Medicare Part D

63.   Medicare Part D is an optional prescription drug benefit that is available to anyone covered by Medicare. Part D benefits can either be provided by "standalone" Prescription Drug Plans (PDPs) that are available to beneficiaries enrolled in Original Medicare, or it can be provided by a Medicare Advantage (MA) plan, to beneficiaries who are enrolled in the plan to get their Part A and B benefits. An MA plan that provides Part D coverage is referred to as a Medicare Advantage Prescription Drug or "MA-PD" plan.

64.   When a beneficiary elects the hospice benefit, he or she is waiving all other rights to Medicare payment for services related to the individual's terminal illness, including Medicare Part D coverage. Medicare Part D coverage for hospice patients is limited to unusual and

exceptional situations in which the drug is medically necessary for treatment of a condition that is completely unrelated to the terminal illness.

65.     The hospice plan of care must include all services necessary for pain and symptom management in connection with the terminal illness. There may be some medications that were used prior to the hospice election that will continue as part of the hospice plan of care, and would be covered under the Medicare hospice benefit, if those drugs are necessary for pain, symptom management, or terminal illness management. However, there may be other medications that were prescribed for the treatment of the terminal illness prior to the hospice election that will be discontinued on the ground that the medication may no longer be effective in treating the illness or may cause negative symptoms or side effects. Such medications would not be covered under the hospice benefit since they would not be reasonable and necessary for the palliation of pain and/or symptom management. If the patient still elected to receive these medications, their associated costs would become a liability of the patient and would not be covered by Medicare Part D. Furthermore, if a patient requests a drug for his or her terminal illness that is not on the MJHS hospice formulary and the beneficiary refuses to try a formulary equivalent first, or the hospice provider determines that the medication is unreasonable or unnecessary for palliation of pain or symptom management related to a terminal illness, the patient may elect to pay for the medication anyway, but no payment will be available under Medicare Part D.

66.     MJHS-HPC contracts with SNFs and ALFs in all five boroughs of New York City to provide hospice care to a subset of residents at those facilities. During Relator's tenure at MJHS-HPC, there were approximately 58 SNFs and ALFs receiving hospice services for their residents. A Registered Nurse Case Manager ("RNCM") assigned by MJHS-HPC was

responsible for managing each hospice patient's medication regimen at those facilities and coordinating the patient's care with his or her medical provider.

67.   Part of the RNCM's duties included reconciling the patient's medications for accuracy and ensuring that the medications prescribed were for the purpose of managing pain and other symptoms associated with the patient's terminal illness. MJHS-HPC was responsible for timely providing all such medications, the cost of which was to be paid exclusively by the hospice benefit. MJHS-HPC also was responsible for identifying which medications related to palliation of symptoms related to terminal illness and which did not. The medications needed to be identified in the patient's plan of care and listed on a form for the facility, with a copy provided to the patient and the patient's family or health care proxy.  A hospice patient's medication regimen needed to be reviewed and reconciled on an ongoing basis.  At every patient visit, there was an opportunity to review the patient's chart, observe the medications ordered for the patient and determine whether the medications were covered or not covered by the hospice benefit. MJHS-HPC benefitted financially if medications were improperly billed to Medicare D, as those were costs avoided by MJHS-HPC.

68.   MJHS-HPC, either intentionally or recklessly, failed to monitor hospice patient medications in the SNF and ALF settings.  The RNCMs frequently left medication regimens in place that were not necessary for palliation of symptoms associated with end-stage illness.  For example, a statin medication prescribed to lower cholesterol would be billed to the Medicare Part D Drug Program even though a terminally ill patient has no need to lower cholesterol levels.  In some cases, patients could receive an average of 4 to 5 medications per day that were not appropriate for hospice care.  The associated costs were charged to Medicare Part D.

69.   Additionally, because the RNCMs would routinely fail to identify medications of

SNF and ALF residents as being the responsibility of MJHS-HPC, common hospice medications that should have been paid for by MJHS-HPC from the hospice benefit were submitted to Medicare Part D for reimbursement. For example, a SNF or ALF patient might have Tylenol prescribed for fever or pain and, because the RNCM did not identify the medication as the responsibility of MJHS-HPC, the facility submitted the charges to Medicare Part D. When such costs are multiplied over multiple drugs, hundreds of hospice patients, dozens of SNF and ALF locations and extrapolated over many months, the charges to Medicare Part D are enormous.

70.  Frequently, moreover, the primary care physician attending the patient in the SNF or ALF would order medications that were not on the MJHS-HPC formulary and the RNCM would not change the medication to an approved formulary medication. An example of this practice would be if a patient's primary care physician ordered the pain medication Ultram, which is not on the MJHS-HPC formulary, and no action was taken by the RNCM to switch the medication to Oxycodone, which is on the MJHS-HPC formulary and would offer similar therapeutic effects. As a result, Medicare Part D, and not the hospice benefit, would pay for the drug. At other times, a hospice patient might require very expensive medications that were not on the MJHS-HPC formulary and, rather than seeking authorization that would have allowed MJHS-HPC to pay for the medications outside the formulary, MJHS-HPC would simply discharge the patient from its care. Relator recalls that happening in the case of one patient with end-stage congestive heart failure and pulmonary hypertension who required two expensive heart medications that were not on MJHS-HPC's formulary and for which MJHS-HPC was unwilling to pay.

71.  MJHS-HPC directors and managers took no actions to change these medication practices in SNFs or ALFs, nor was there any attempt to hold RNCMs accountable for their failure to properly monitor and coordinate the medication regimens of hospice patients.

30

Interdisciplinary Team meetings presented the perfect opportunity to review medications for whether they were appropriate or covered by the hospice benefit or whether special authorization was required from MJHS-HPC management.  Unfortunately, this never occurred at the Interdisciplinary Team meetings of which Relator has knowledge.  Moreover, as noted above, MJHS-HPC knew that all drug costs paid by Medicare Part D were costs that MJHS-HPC would not incur itself.  Whether intentionally or through reckless indifference, MJHS-HPC permitted grossly deficient medication practices that violated the terms and conditions of the hospice benefit, and that enriched MJHS-HPC at the expense of Medicare Part D.

### F. **Retaliatory Employment Actions**

72.    The MJHS-HPC leadership, including but not limited to Barbara Hiney, Joyce Palmieri and Teresa D'Alessio singled out Relator for insulting and unprofessional treatment. Because Relator questioned supervisory personnel about the improper admission of hospice patients, leadership began viewing Relator unfavorably and subjected her to demeaning and hostile comments.  Palmieri would frequently intimidate Relator by screaming at Relator on the phone so loud that others in Relator's work space could hear.  Those calls often resulted from Relator's questioning Palmieri about the non-terminal status of a patient.  Hiney also was openly hostile and disrespectful to Relator on many occasions, and both Hiney and D'Alessio made undermining and insulting comments to Relator in front of co-workers.

73.    Leadership also would deny Relator the administrative support she needed to properly manage the Block residence, forcing her to work many more hours than any of the other salaried Managers at MJHS-HPC. This practice was highlighted in October 2012, during the Hurricane Sandy effort to relocate hospice patients to other facilities, when Relator was forced to work consecutive 24-hours shifts without any relief, little food and only intermittent sleep, while

other available nursing staff were allowed to go home without being assigned to the effort. At the same time, Hiney and Palmieri, who are also Registered Nurses, either went home or stayed in hotels and ate in restaurants. At one point during the Hurricane Sandy effort, Palmieri even commented to Relator how bloated she was from eating in restaurants and made a public display by lifting her shirt and showing Relator her swollen stomach.

74. Because Relator complained of compliance violations by MJHS-HPC that constituted fraud against the government and resulted in MJHS-HPC's submission of false claims totaling many millions of dollars, Relator was subjected to the adverse employment actions and hostile work environment describe above. MJHS-HPC had no legitimate, non-retaliatory reason for taking these actions against Relator. Such actions were malicious and/or in reckless disregard of Relator's civil rights. At all times relevant to this action, Relator performed her job in an exemplary fashion and would not have suffered any adverse employment action but for her complaints concerning violations constituting fraud against the government. The relentless unprofessional, hostile and demeaning treatment of Relator ultimately led to Relator's resignation from MJHS-HPC, effective May 9, 2013.

## VI.    CAUSES OF ACTION

### COUNT ONE
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(A)

75. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

76. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

77.   By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States government for payment or approval. 31 U.S.C. § 3729(a)(1)(A).

78.   The United States, unaware of the falsity of the claims made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

79.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

80.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

**COUNT TWO**
**(Federal False Claims Act)**
<u>**31 U.S.C. § 3729(a)(1)(B)**</u>

81.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

82.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, that were material to false or fraudulent claims, within the meaning of 31 U.S.C. § 3729(a)(1)(B).

83.   The United States, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

84.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

33

85.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT THREE
## (Federal False Claims Act)
## 31 U.S.C. § 3729(a)(1)(C)

86.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

87.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq.*, as amended.

88.    By virtue of the acts described above, Defendants conspired with others known and unknown to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of 31 U.S.C. § 3729(a)(1)(C). Defendants, moreover, took substantial steps in furtherance of the conspiracy, *inter alia*, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

89.    By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

90.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. § 3729(a)(1)(C) as described herein.

## COUNT FOUR
### (Federal False Claims Act)
### 31 U.S.C. § 3729(a)(1)(G)

91.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

92.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government, within the meaning of 31 U.S.C. § 3729(a)(1)(G).

93.   The United States, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

94.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

95.   Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT FIVE
### (Federal False Claims Act – Retaliation Violation)
### 31 U.S.C. § 3730(h)

96.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

97.   Defendant MJHS-HPC had a duty under the False Claims Act, 31 U.S.C. § 3730(h), to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act.   Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

98.   As set forth above, Relator engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to supervisory personnel regarding various fraudulent activities to enhance Medicare and Medicaid reimbursement; bringing this fraudulent and illegal activity to the attention of supervisory personnel; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

99.   Defendant was well aware that Relator had engaged in these protected activities, and it discriminated and retaliated against Relator for engaging in such protected conduct by taking adverse employment actions against Relator.

100.   Defendant's actions damaged and continue to damage Relator in violation of 31 U.S.C. § 3730(h).   As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to her career. In connection

with this claim, Relator seeks all damages and other appropriate relief authorized by the False

Claims Act, as well as litigation costs and reasonable attorneys' fees.

## COUNT SIX
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(a)

101.   Relator repeats and realleges each and every allegation contained in paragraphs 1

through 74 above as though fully set forth herein.

102.   This is a claim for treble damages and penalties under the New York False Claims

Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

103.   By virtue of the acts described above, Defendants knowingly presented or caused to

be presented, false or fraudulent claims to New York State for payment or approval, within the

meaning of N.Y. Finance Law § 189(1)(a).

104.   New York State, unaware of the falsity of the claims made or caused to be made by

the Defendants, paid and continues to pay the claims that would not be paid but for Defendants'

unlawful conduct.

105.   By reason of the Defendants' acts, New York State has been damaged, and continues

to be damaged, in a substantial amount to be determined at trial.

106.   Additionally, New York State is entitled to the maximum penalty of $12,000 for

each and every false and fraudulent claim made and caused to be made by Defendants arising

from their unlawful conduct as described herein.

## COUNT SEVEN
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(b)

107.   Relator repeats and realleges each and every allegation contained in paragraphs 1

through 74 above as though fully set forth herein.

108.   This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

109.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted facts, material to false or fraudulent claims, within the meaning of N.Y. Finance Law § 189(1)(b).

110.   New York State, unaware of the falsity of the records, statements and material omissions made or caused to be made by the Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

111.   By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

112.   Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT EIGHT
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(g)

113.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

114.   This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

115.   By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealed or knowingly and improperly avoided or

decreased an obligation to pay or transmit money or property to the Government, within the meaning of N.Y. Finance Law § 189(1)(g).

116.  New York State, unaware of the falsity of the records and statements and of the Defendants' concealment and unlawful conduct, was denied an opportunity to claim and demand return of the money and property to which it was legally entitled.

117.  By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

118.  Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

### COUNT NINE
### (New York False Claims Act)
### N.Y. Finance Law § 189(1)(c)

119.  Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

120.  This is a claim for treble damages and penalties under the New York False Claims Act, N.Y. Finance Law §§ 187 *et seq.*, as amended.

121.  By virtue of the acts described above, Defendants conspired with others known and unknown to defraud New York State by inducing New York State to pay or approve false and fraudulent claims, and to avoid and conceal an obligation to pay money and property, within the meaning of NY Finance Law § 189(1)(c). Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

122. By reason of the Defendants' acts, New York State has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

123. Additionally, New York State is entitled to the maximum penalty of $12,000 for each and every false and fraudulent claim made and caused to be made by Defendants arising from their unlawful conduct as described herein.

## COUNT TEN
### (New York False Claims Act – Retaliation Violation)
### N.Y. Finance Law § 191

124. Relator repeats and realleges each and every allegation contained in paragraphs 1 through 74 above as though fully set forth herein.

125. Defendant MJHS-HPC had a duty under the New York False Claims Act, N.Y. Finance Law § 191, to refrain from taking discriminatory or retaliatory actions against employees who take lawful actions in furtherance of a False Claims Act action, or who make lawful efforts to stop others from violating the False Claims Act. Such discriminatory and retaliatory action includes, but is not limited to, discharging, demoting, suspending threatening or harassing an employee for engaging in such protected conduct.

126. As set forth above, Relator engaged in numerous activities that are protected under the False Claims Act. This included investigation and inquiries to supervisory personnel regarding various fraudulent activities to enhance Medicare and Medicaid reimbursement; bringing this fraudulent and illegal activity to the attention of compliance personnel and those running the CIH PMSR Program; refusing to participate in, assist, or ignore a scheme to defraud the government; and other similar actions to stem the FCA violations described above.

127. Defendant was well aware that Relator had engaged in these protected activities,

and it discriminated and retaliated against Relator for engaging in such protected conduct by taking adverse employment actions against Relator.

128.   Defendant's actions damaged and continue to damage Relator in violation of N.Y. Finance Law § 191.   As a direct and proximate result of the foregoing, Relator has lost the benefits and privileges of employment and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to her career. In connection with this claim, Relator seeks all damages and other appropriate relief authorized by the False Claims Act, as well as litigation costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Relator, acting on behalf and in the name of the United States of America and New York State, demands and prays that judgment be entered against Defendants under the Federal False Claims Act as follows:

(1)   That Defendants cease and desist from violating 31 U.S.C. §§ 3729 *et seq.* and N.Y. Finance Law §§ 187 *et seq.* as set forth above;

(2)   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

(3)   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages that New York State has sustained because of Defendants' actions, plus a civil penalty of not less than $6,000 and not more than $12,000 for each violation of N.Y. Finance Law §§ 187 *et seq.*

(4)      That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d) and N.Y. Finance Law § 190;

(5)      That by reason of Defendant MJHS-HPC's retaliatory and discriminatory actions and recommended discharge of Relator in violation of 31 U.S.C. § 3730(h) and N.Y. Finance Law § 191, judgment be entered in favor of Relator and against Defendant, that Relator be awarded double any back-pay losses, plus front pay, interest, costs, attorneys' fees and special damages for emotional distress and harm to her reputation, and that Defendant should be enjoined from engaging in continued retaliatory and discriminatory actions; and

(6)      That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

(7)      That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: July 7, 2014

By:     _Geoffrey R. Kaiser_

Geoffrey R. Kaiser, Esq. (GK-6991)
Kaiser Law Firm, PLLC
926 RXR Plaza
Uniondale, New York 11556-0926
Tel. (516) 570-3071

Attorney for Plaintiff-Relator
 Ellyn D. Ward